UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
———————————————————————x
ADEBOWALE CHRISTIANA ONANUGA,
Individually on behalf of and as Administrator of
the Estate of Ebenezer Adebayo Onanuga,

        Plaintiff-Counterclaim Defendant,

  -against-                                        03 Civ. 5405 (CM)(GAY)

PFIZER, INC.,

        Defendant-Counterclaim Plaintiff.

———————————————————————x

MEMORANDUM DECISION AND ORDER GRANTING THE
MOTION OF DEFENDANT FOR SUMMARY JUDGMENT DISMISSING THE
COMPLAINT AND DENYING THE MOTIONS OF BOTH PLAINTIFF
AND DEFENDANT ON THE COUNTERCLAIM

McMahon, J.:

The following facts are undisputed:[1]

Ebenezer Adebayo Onanuga (plaintiff's decedent) worked for 22 years at a Nigerian subsidiary of defendant Pfizer, Inc. The subsidiary was named Pfizer Products, LLC (formerly known as Pfizer Products Ltd).

Pfizer Inc. and Pfizer Products LLC were at all times separate corporate entities. To avoid confusion – of which there is far too much in this record, most of it on plaintiff's part –

---

[1] Plaintiff failed to file a Rule 56.1 Statement in opposition to defendant's motion for summary judgment, and so all the averments of fact in Defendant's Rule 56.1 Statement – though not the conclusions defendant draws therefrom – are deemed admitted. Holtz v. Rockefeller & Co., Inc., 258 F. 3d 62, 72 (2d Cir. 2001); Galasso v. Eisman, Zucker, Klein & Ruttenberg, 310 F. Supp. 2d 569, 574 (S.D.N.Y. 2004). In this case application of the rule has no punitive effect whatever, since plaintiff's evidence, which the court has reviewed, does not raise any genuine issue of fact in contravention of the factual averments in Defendant's Rule 56.1 Statement.

defendant will be referred to hereinafter as "Inc" and the subsidiary will be referred to as "LLC."

On May 14, 1997, Inc divested itself of its 60% shareholder ownership in LLC, selling out to the local management group of that company. Some of the employees of the subsidiary were reemployed by another Pfizer subsidiary, Pfizer Specialities Ltd. Most – including plaintiff's decedent –  remained with Pfizer LLC. Thus, as of May 14, 1997, plaintiff's decedent ceased to have any affiliation with defendant.

At the time his employer ceased to be affiliated with Inc, plaintiff's decedent held options to purchase Pfizer stock. He was awarded these options in 1993, 1994, 1995 and 1996 pursuant to Inc's Stock and Incentive Plan ("the Plan"). The terms of the stock options were governed by the Plan, which contained several pertinent provision relating to the lapsing of options. First, the Plan provided, as did each respective option award letter, that Onanuga's options would lapse if he retired within one year following the date of the award. Assuming he remained employed for a year after each particular award, the Plan further provided that, "The option, to the extent not exercised, shall terminate . . . when the optionee ceases to be an employee for any reason including retirement . . . however . . . if the option so provides, in the event that the optionee has retired or is eligible for retirement under Sections 4a., b., or d. or the Company's Retirement Annuity Plan,  as may be amended from time to time, or under any pension or retirement plan maintained by the Company or any of its subsidiaries, the optionee . . . may elect to exercise the option at any time until such option expires by its terms . . . ." The cited portions of the Pfizer Retirement Annuity Plan refer to "normal," " late," and "early" retirement, respectively; the word "Company" refers to Inc.

As of the date LLC ceased to be an Inc subsidiary, plaintiff's decedent had not exercised

many of his stock options.  Nor did plaintiff exercise them within a week of May 14, 1997, pursuant to a special resolution of Inc's Employee Compensation and Management Development Committee (which administers the Plan, which had accelerated the vesting of all his unvested stock options and granted him (and other similarly situated employees of LLC) one additional week following the divestiture to exercise their options.

What did happen was this: On the same day that Inc divested itself of LLC – May 14, 1997 – plaintiff's decedent gave LLC, his employer, three months notice that he would be retiring effective August 14, 1997. The three months' notice was required by the terms of Onanuga's employment with LLC. Plaintiff's decedent thereafter worked for LLC – which soon changed its name to Neimeth International Pharmaceuticals (though for ease of reference I will continue to call it "LLC") – for the next three months. LLC accepted plaintiff's resignation, which took effect on August 14, 1997. LLC, which had retained the pension obligations under LLC's Retirement Plan, was responsible for the payment of Onanuga's pension. And less than a month after his retirement,  LLC paid plaintiff's decedent his pension contribution, from LLC's longstanding defined contribution pension plan, together with separation pay, less than a month after his retirement.

When the LLC employees who remained with that company were separated from Inc on May 14, 1997, Inc's Human Relations Department coded Onanuga's employment status in its database, coding him as "retired" instead of "separated." As a result, plaintiff's decedent was actually able to exercise some of his options in March 1998; he realized almost $300,000 from that transaction. Onanuga did not exercise any other options prior to his death in 2001. He did continue to receive information about his stock option account from Merrill Lynch, which

administered the Plan for Inc.

What Inc now describes as a "coding error" or "data entry error" was not discovered until January 2003, at which time plaintiff was attempting to exercise additional stock options on behalf of her husband's estate. By letter dated 30 April 2003, Inc notified the Onanuga family that the options had actually expired in May 1997. It also deactivated Onanuga's stock option account at Merrill Lynch.

Plaintiff, Onanuga's widow and executrix, now sues Inc for breaching its contract with her husband. Inc counterclaims for return of the $286,360 profit realized by Onanuga on the 1998 exercise of the ostensibly expired options.  Inc has moved for summary judgment dismissing all of plaintiff's claims against it.  Plaintiff has moved for summary judgment dismissing Inc's counterclaim against her.

Summary of Argument

Notwithstanding the incredible amount of paper filed with the Court by both sides, the dispute is really quite simple. Both parties agree (plaintiff somewhat reluctantly) that the contract that was allegedly breached is the Plan. By its clear terms, the Plan provides that Onanuga's stock options lapsed when he failed to exercise them by May 21, 1997. The only way around this rule would be if, prior to the time he "cease[d] to be a Company employee . . . ," Onanuga either "has retired or [was] eligible for retirement under . . . any pension or retirement plan maintained by the Company or any of its subsidiaries . . . ."

Plaintiff's decedent was the Company Secretary of LLC, and a sophisticated businessman. It seems clear to this court that, by submitting his three months' notice of intent to retire on the very day Inc spun off LLC, Onanuga was trying to bring himself within that

exception to the usual rule. And indeed, plaintiff argues strenuously that "The message [plaintiff's decedent] wants this Court to hear is that he did not participate in the management buyout in 1997 either as an employee or owner of Neimeth [LLC], his employment with Pfizer was not terminated in 1997, and he neither worked nor retied from Neimeth [LLC]. He retired from Pfizer after 23 years of outstanding contributions and dedicated service to Pfizer." Pl. Memorandum of Law at 23.

    I have no doubt that plaintiff's decedent gave LLC (his employer) 23 years of outstanding contributions and dedicated service. However, Onanuga clearly had not retired as of May 14, 1997, when Inc spun off LLC. Indeed, he did not even submit his retirement papers until that day. Per the undisputed facts, his retirement was not effective until three months later, on August 14, and he continued to work for LLC for that three month period, drawing his regular compensation. One is not "retired" until one's retirement is effective, and plaintiff's retirement was not effective until August 14, 1997. Moreover, during that three month period, Onanuga did not work for "Pfizer" in the sense of Inc, as plaintiff's papers suggest. Indeed, he never worked for Pfizer Inc. throughout all his 23 years of employment. Plaintiff's effort to conflate these two wholly separate, albeit once-affiliated, corporations (which is, of course, the reason I insist on calling the two corporations "Inc" and "LLC" and refuse to call either of them "Pfizer") does not alter reality.

    The only question raised by the complaint (and it is a rather sophisticated question) is whether plaintiff's decedent either "retired" or was "eligible for retirement" in accordance with certain specified provisions of either Inc's Retirement Annuity Plan or under any pension or retirement of an Inc subsidiary that was "similar" to Inc's Retirement Annuity Plan. If he was,

then it would appear that his options did not lapse. If he was not, then the options did lapse.

As there are no disputed issues of material fact, and Onanuga's eligibility for retirement hinges on the interpretation of certain documents (notably the LLC Retirement Plan), this case is appropriately decided on a motion for summary judgment. Under Rule 56(c) of the Federal Rules of Civil Procedure, the Court will grant summary judgment if the evidence offered shows that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.  See Celotex Corp. v. Catrett, 477 U.S. 317 (1986).  The Court views the record in the light most favorable to the non-movant and resolves all ambiguities and draws all reasonable inferences against the movant.  See United States v. Diebold, Inc., 369 U.S. 654, 655 (1962); Donahue v. Windsor Locks Bd. of Fire Commn'rs, 834 F.2d 54, 57 (2d Cir. 1987).

*Defendant is Entitled to Summary Judgment Dismissing the Complaint*

Inc argues that plaintiff's decedent did not retire and was not eligible to retire under a qualifying retirement plan so as to extend the life of his otherwise lapsing stock options for three reasons. The first two arguments assume – contrary to the fact – that plaintiff could be deemed to have "retired" on May 14, 1997, when he submitted his three months' notice. The third argument does not. Since the third argument is the only relevant argument for our purposes – because plaintiff did not in fact retire on May 14, 1997 – I will discuss it first.

Inc argues that plaintiff was not eligible for "normal," "early" or "late" retirement under Inc's Retirement Annuity Plan. The Plan specifies a normal retirement age of 65. Onanuga was not eligible for normal retirement because he was not yet 65 years old. Nor was he eligible for Late Retirement, which refers to retirement after Normal Retirement Age. So only if plaintiff's decedent either took or was eligible for Early Retirement can plaintiff maintain her action.

Pursuant to the Plan, Early Retirement is available to employees who are at least 55 years old with 10 or more years of credited service. As of May 14, 1997 – when plaintiff's decedent both submitted his retirement papers and was separated from Inc as a result of the LLC spin off – he was 54 years old. Indeed, by the time his retirement from LLC became effective, on August 14, 1997, Onanuga was still not 55 years old. Plaintiff's decedent was born no earlier than October 12, 1942 (and perhaps on December 10, 1942 – the parties are not quite sure, since Nigerians and Americans read the legend "12/10/1942" differently). So notwithstanding that he had well more that 10 years of credited service as of both May and August 14, 1997, he was not yet 55 on either of those dates. Therefore, plaintiff was not "eligible for retirement under" the Early Retirement provision of the Company's Retirement Annuity Plan.

Because plaintiff was not eligible for an exemption from the lapsing of his options per the terms of the Plan, his options lapsed when LLC ceased to be an Inc subsidiary, also per the terms of the Plan. This means there was no breach of contract on Inc's part, and the complaint must be dismissed.

It is, frankly, of no moment that plaintiff's decedent believed that he could retain his stock options for later exercise by submitting his retirement papers on the day of the spin off and not remaining with LLC. Nor is it of any moment that other persons, including persons employed by LLC in Nigeria, believed that Onanuga retired in a manner that permitted him to avoid the lapsing of his unexercised stock options. People misinterpret their rights under contracts all the time. That is why we end up with breach of contract lawsuits and actions seeking a declaration of contractual rights. Misinterpretations do not work amendments to contracts. The only thing that matters is what the Plan said, not what plaintiff's decedent or anyone else thought it said.

Neither is it of any moment that plaintiff's decedent, and thereafter his widow, continued to receive stock plan status notices after his options lapsed. Plaintiff offers no evidence tending to suggest that Pfizer's explanation for this anomaly – namely, that a data entry error caused Onanuga to be misclassified as a retiree for almost six years – is untrue. As defendant correctly argues, plaintiff's receipt of these statements does not create rights that do not exist under the terms of the Plan itself.

*Plaintiff's Alternative Arguments Lack Merit*

Were this court (and Inc) to be in error, and were it to be the fact that plaintiff's decedent actually retired on May 14, 1997, Inc proffers two additional reasons why plaintiff was not eligible for an exemption from the usual rule that his options lapsed when he separated from Inc in the spin-off of LLC.

First, Inc argues that the LLC Retirement Plan –which is the plan that Onanuga retired under – is not "similar" to Inc's Retirement Annuity Plan.  Inc's plan is a defined benefit plan, which paid a retirement annuity to retired employees. LLC's Retirement Plan was not a defined benefit plan. Instead, LLC maintained a defined contribution plan, which took contributions from both employer and employee, and which paid out the full amount of those contributions to Onanuga upon his retirement. Inc's Employee Compensation and Management Development Committee –  which has sole discretion, per the terms of the Plan, to interpret the Plan, and to decide whether an employee is entitled to benefits under the Plan –  has determined that LLC's "defined contribution plan" is not "similar" to Inc's "defined benefit plan." (Scandone Decl., ¶ 2, Exh. A.)

By law, "if an employee is part of a 'plan' that gives a 'committee' sole discretion to

interpret the plan and determine whether the employee is entitled to benefits under the plan, a court can review such determinations to see whether they were made fraudulently, in bad faith, or arbitrarily." Lucente v. International Business Machines Corp., 262 F. Supp. 2d 109, 114-115 (S.D.N.Y. 2003). As the Second Circuit ruled almost three decades ago, "If the decision is supported by a reasonable basis, the court may not substitute its judgment for that of [the employer] on the disputed factual issues." Gehrhardt v. General Motors Corp., 581 F. 2d 7, 11 (2d Cir. 1978).

There is no evidence in the record of fraud, bad faith or arbitrariness. It appears from the undisputed evidence in the record that, in administering the Plan, the Committee has consistently refused to recognize defined contribution plans as being "similar" to the Inc's Retirement Annuity Plan.  (Gates Decl. ¶2 and Ex. B and I at §2 thereof). Plaintiff was so advised in the letter of April 30, 2003 sent to her by William J. Scandone. (Scandone Decl. 2 and Ex. A.) It does not appear from this record that the Committee made an arbitrary, one-time decision regarding Onanuga's situation, and there is no evidence that he was treated any differently than any other Pfizer or Pfizer subsidiary employee.  (Gates Decl. ¶2 and Ex. B and I; Scandone Decl. ¶ 2 and Ex. A ("Pfizer . . . does not recognize defined contribution plans as retirement plans for retirement treatment for stock options.").

Second, plaintiff could get around the difference between LLC's plan and Inc's plan if he were eligible to participate in a defined benefit retirement plan sponsored by the Nigerian Government. Specifically, the April 30, 2003 letter from William J. Scandone to Dayo Onanuga explains that:

> In order to receive retirement treatment of Pfizer stock options
> granted before February 2003, an employee must meet the

> following criteria, in this specific order: (1) Retirement under a company sponsored defined benefit plan. There was no defined benefit plan in Nigeria in 1997. (2) If the local entity does not sponsor a defined benefit plan then Pfizer looks to retirement under a National defined benefit plan that has a minimum age and service requirement. Nigeria did not have a National Plan in 1997. (3) If the local entity does hot have a defined benefit plan and/or a National defined benefit plan as described above does not exist, then Pfizer defines eligibility for retirement treatment of stock options as an employee who is age 55 with 10 or more years of service at separation from service.

Ex. A at 3. Inc argues that plaintiff was not entitled to an exception from the usual rule of lapsing because Nigeria did not have the requisite National defined benefit retirement plan for its citizens.

Plaintiff offers no evidence that there was any national benefit plan or scheme in place in Nigeria in 1997, when plaintiff's decedent retired. Defendant's sworn testimony to the effect that there was no such plan is uncontradictd. So this exception to the general rule is of no help to plaintiff, either.

In the absence of either an employer-sponsored or a nationally-sponsored defined benefit plan, Mr. Onanuga was eligible to keep his options only if he was 55 years old when he retired. He was not.

For these reasons, plaintiff's alternative arguments are unavailing.

The complaint is dismissed, with prejudice.

*The Counterclaim*

I turn next to Inc's counterclaim for the return of the money realized by Onanuga when Pfizer wrongfully honored his 1998 exercise of his lapsed options. Inc brings its counterclaim under a theory of unjust enrichment and money had and received.

10

The elements of unjust enrichment are that the defendant benefitted, at Inc's expense, and that equity and good conscience require restitution. Kaye v. Grossman, 202 F. 3d 611, 616 (2d Cir. 2000). The elements of money had and received are that the defendant received money that belonged to the plaintiff, that the defendant benefitted from receiving the money, and that principles of equity and good conscience should not permit plaintiff to keep the money. Aaron Ferer & Sons, Ltd., v. Chase Manhattan Bank, N.A., 731 F. 2d 112, 125 (2d Cir. 1984).

Given my conclusion regarding the non-viability of the complaint, it is obvious that plaintiff's decedent received money that belonged to Inc when Onanuga exercised the stock options after they had expired. This benefitted Onanuga at Inc's expense. The only question is whether equity and good conscience require that the money be restored to Inc.

Plaintiff's principal argument in opposition to the motion is that Onanuga is dead, so she should be allowed to keep the money. Onanuga's death is of no legal relevance. Plaintiff's real argument is that Inc has waited far too long to recover the money it wrongfully paid out. In that regard, she asserts the equitable defenses of laches, equitable estoppel, ratification and waiver.

The evidence in the case does not support any claim of ratification. Ratification will not be inferred where there is no act on the part of the corporation to show an intention, either express or implied, to ratify, but where, on the contrary, it seeks to repudiate the unauthorized act as soon as it has knowledge of it. See N.Y. Jur. Bus. Relations § 660; Sovereign Metal Corp. v. Ciraco, 210 A.D.2d 75, 621 N.Y.S.2d 296 (1st Dep't 1994) (citing Soma v. Handrulis, 277 N.Y. 223, 230 (1938)). The exercise of the options was a one time event, and the wrongful payment was also a one time event. It happened. There was no subsequent opportunity for ratification; indeed, per the undisputed evidence, as soon as Inc learned of its coding error – the first time that

11

it could have ratified its error – it disclaimed the error and took the position that the exercise violated the terms of the Plan.

Similarly, there is no showing of waiver here. It is well settled that "[a] waiver is 'the intentional relinquishment of a known right with both knowledge of its existence and an intention to relinquish it.'" Civil Service Employees Ass'n, Inc., Local 1000, AFSCME, AFL-CIO v. Kinsella, 194 A.D.2d 1054, 1056, 599 N.Y.S.2d 671 (3rd Dep't 1993) (citing Werking v. Amity Estates, 2 N.Y.2d 43, 52, 137 N.E.2d 321 (1956), appeal dismissed, cert. denied 353 U.S. 933, 77 S.Ct. 812, 1 L. Ed. 2d 756 (1957). Such waiver must be clear, unmistakable, and without ambiguity. Id. (quoting Matter of Civil Serv. Empls. Assn. v. Newman, 88 A.D.2d 685, 686, 450 N.Y.S.2d 901(3rd Dep't 1982)). There is no evidence that Inc intentionally and knowledgeably waived its rights. In fact, it was a "coding error" – unbeknownst to Inc until January 2003 – that caused Mr. Onanuga to be able to exercise his expired stock options and which caused the subsequent status notices to be mailed to plaintiff. From the date of the erroneous payment, Inc had the right to recover the money transferred to Mr. Onanuga when he exercised the expired stock options. See Haimes v. Schonwit, 268 A.D. 652, 655, 52 N.Y.S.2d 272, 276 (2d Dep't 1945). Because there is no evidence that Inc knew of that right (until January 2003) or ever manifested an intent to waive it, this defense is without merit.

Plaintiff's argument that Inc's counterclaims must be dismissed on the ground that Inc is guilty of "inexcusable delay" in bringing their causes of action is also without merit. The defense of laches is unavailable in an action at law that is commenced within the statutory period of limitation. In re Liquidation of American Druggists' Ins. Co., 15A.D.3d 268, 268, 789 N.Y.S.2d 483, 484 (1st Dep't 2005); Columbus Trust Co. v. Compolo, 110 A.D.2d 616, 618, 487

N.Y.S.2d 105 (2d Dep't 1985).

"'An action for money had and received, although governed by equitable principles is an action at law traditionally triable by a jury . . . .'" In re CIS Corp., 172 B.R. 748, 762 (S.D.N.Y. 1994) (quoting Forrest v. Fuchs, 126 Misc.2d 8, 481 N.Y.S.2d 250, 252 (Sup.Ct. Nassau Co.1984) (citations omitted); see also Richardson Greenshields Sec., Inc. v. Mui-Hin Lau, 693 F.Supp. 1445, 1454 (S.D.N.Y.1988); Matter of Estate of Witbeck, 245 A.D.2d 848, 850, 666 N.Y.S.2d 315, 317 (3d Dep't 1997).

Although the claim of unjust enrichment is for equitable relief, the counterclaim seeks to enforce in equity a legal right, to wit, the right to recover the money received by Onanuga that belonged to Inc when Onanuga exercised the stock options after they had expired. "It is a well-established principle of equity, that where there is a discretion to bar a right on the ground of delay, the courts will, in the exercise of that discretion, use the Statute of Limitations as a rule to guide their action." See Schreier v. Cummings, 250 A.D. 808, 808, 294 N.Y.S. 163, 164 (3d Dep't 1937) (quoting Pollitz v. Washbash Railroad Co., et al, 207 N.Y. 113 (1912) (holding that the alleged cause of action is barred by the applicable statute of limitations, not by laches).

The counterclaims for money had and received and for unjust enrichment are both governed by a six-year statute of limitations. See N.Y. CPLR § 213 (McKinneys 2004); Equitable Life Assur. Soc. of U.S. v. Branch, 32 A.D.2d 959, 960, 302 N.Y.S.2d 958 (2d Dep't 1969); Lawyers' Fund for Client Protection of the State of New York v. Gateway State Bank, 239 A.D.2d 826, 827, 658 N.Y.S.2d 705 (3d Dep't 1997). The earliest date on which the statute of limitations could have begun to run on the causes of action stated in defendant's counterclaim is March 19, 1998, when Mr. Onanuga exercised the terminated options. He necessarily

13

received the value of these options – totaling almost $300,000 – on or shortly after that date. The statute of limitations begins to run on a claim for money had and received or unjust enrichment as soon as the initial payment is made.  See Haimes, *supra*, 268 A.D. at 655.  The statute of limitations, therefore, expired six-years after the date of the initial payment – sometime after March 19, 2004.  The plaintiff's claim was filed on July 21, 2003, and the counter-claim was filed on November 24, 2003.  Clearly, this action was brought within the period of limitations, making the defense of laches unavailable.

Therefore, defendant is entitled to summary judgment dismissing the defenses of ratification, waiver and laches.

The remaining defense proffered by plaintiff is equitable estoppel.  Analysis of this defense is somewhat more complicated.

Under New York law, an estoppel requires three elements on the part of the party estopped (here, Inc): (1) conduct which is calculated to convey the impression that the facts are otherwise than, and inconsistent with, those which the party subsequently attempts to assert; (2) intent that such conduct (representation) will be acted upon; and (3) knowledge, actual or constructive, of the true facts.  See Townley v. Emerson Elec. Co., 178 Misc.2d 740, 746 (Sup. Ct. Monroe County 1998) (citing 21 N.Y. Jur, Estoppel, Ratification, and Waiver § 21). The party claiming the benefit of an equitable (plaintiff) must also establish three elements: (1) lack of knowledge and of the means of knowledge of the truth as to the facts in question; (2) reliance upon the conduct of the party estopped; and (3) action based thereon of such a character as to change his position prejudicially. Brelsford v. USAA, 289 A.D.2d 847, 849, 734 N.Y.S.2d 707 (3rd Dep't 2001).

The undisputed evidence bars Onanuga from relying on equitable estoppel because she has not raised any genuine issue of fact concerning any detrimental change of position. Plaintiff offers no evidence showing that her (or her late husband's) receipt of the erroneous account statements caused her to take any action that changed her position in a manner that was prejudicial to her interests. Plaintiff arguably relied on receipt of the periodic statements when she decided to exercise options in 2002 (although it is entirely possible that she relied on something else entirely, including information she had received from her late husband). But the only action she took was to exercise the options. That exercise in no way constituted a change of position on her part. Nor did her decision to try to exercise the options cause her any detriment. Learning the truth about the status of her husband's options is not detrimental reliance on plaintiff's part.

Therefore, defendant is also entitled to summary judgment dismissing plaintiff's defense of equitable estoppel.

As stated above, the record is clear that Mr. Onanuga benefitted – at Inc's expense – by receiving by receiving nearly $300,000 from the exercise of expired stock options in March of 1998. Therefore, both of the claims asserted in Inc's counterclaim turn on whether, under principles of "equity and good conscience," Ms. Onanuga should be permitted to keep the money her husband erroneously received from Inc.

The undisputed evidence shows that Inc was operating under a mistake of fact when it paid out the money to plaintiff's decedent. "Generally, courts will look to see if a benefit has been conferred on the defendant under mistake of fact . . . if the benefit still remains with the defendant, if there has been otherwise a change of position by the defendant, and whether the

defendant's conduct was tortious or fraudulent." Manufacturers Hanover Trust Co. v. Chemical Bank, 160 AD2d 113, 559 NYS2d 704 (1st Dep't 1990) (quoting Paramount Film Distrib. Corp. v. State of New York, 30 N.Y.2d 415, 421 (1972), *motion to amend remittitur granted*, 30 N.Y.2d 678, *cert denied*, 414 U.S. 829.) If Inc's recovery would lead to an undue net loss to plaintiff by reason of a changed position – as might be the case if the funds have been disbursed – then recovery may be denied, the parties being equally innocent. Paramount, 30 N.Y.2d at 422.

Although defendant has made a counterclaim both in law (money had and received) and in equity (unjust enrichment), I need not rely on the labels attached by Inc to determine whether a jury trial is appropriate, but rather on the substance of the claims and the relief sought. In re CIS Corp., 172 B.R. 748, 761-62 (S.D.N.Y. 1994) (citing Dairy Queen v. Wood, 369 U.S. 469, 477-78, 82 S.Ct. 894, 899-900, 8 L. Ed. 2d 44 ("[T]he constitutional right to trial by jury cannot be made to depend upon the choice of words used in the pleadings."); In re Data Compass Corp., 92 B.R. 575, 577 (Bankr.S.D.N.Y.1988); Matter of Paula Saker & Co., Inc., 37 B.R. 802, 808 (Bankr.S.D.N.Y.1984) (in determining whether right to jury trial exists court need not rely on the theory pleaded but must look to facts to determine if plea in equity is needed)).

The claim asserted and the relief sought in this action is legal in nature, affording the right to a jury trial. See, e.g., In re CIS Corp., *supra*, 172 B.R. at 762. "The obligation to return money received under mistake is one imposed by law and generally the form of the action to recover such money is one for money had and received, at least where the transaction is executed and recovery is sought of money paid under a contract." Id. (quoting Forrest v. Fuchs, 126 Misc.2d 8, 481 N.Y.S.2d 250, 252 (Sup.Ct. Nassau Co.1984)). Therefore, although governed by

16

Granfinanciera, S.A. v. Nordberg, 492 U.S.33, 43, 109 S.Ct. 2782, 106 L. Ed.2d 26 (1989) (recognizing that actions for "money had and received" are traditionally legal actions requiring trial by jury); Cohen v. Cohn, 18 A.D.2d 896, 237 N.Y.S.2d 807, 808 (1st Dep't 1963) (per curiam) (right to jury trial in action for money had and received)).

Whether principles of "equity and good conscience" require restitution by plaintiff of a benefit conferred under a mistake of fact is a "pure question of fact." In re Welton's Estate, 141 Misc. 674, 686, 253 N.Y.S. 128, 143 (Sur. Ct. 1931). However, on this motion for summary judgment, such facts have not been developed in the record before me by either party. I therefore deny both sides' motions for summary judgment. We will hold jury trial on the issue of how much money, if any, Inc is entitled to recover from plaintiff under principles of "equity and good conscience." See, e.g., Tishman Realty and Construction v. Schmitt, 69 Misc.2d 584, 586, 330 N.Y.S.2d 174 (Civ. Ct. City of New York 1972).

This constitutes the decision and order of the Court.

Date: May 10, 2005

*[signature]*

_____
U.S.D.J.